AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

11/22/2024

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of ⟩
⟩
*(Briefly describe the property to be searched* ⟩
*or identify the person by name and address)* ⟩     Case No.   3:24-mj-711
⟩
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ⟩
⟩

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A-2

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 USC s. 846 | conspiracy to distribute and possess with intent to distribute controlled substances |
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |
| 18 USC s. 922(g)(1) | felon in possession of a firearm |

The application is based on these facts:

See Attached Affidavit of Austin Roseberry

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Austin Roseberry*

*Applicant's signature*

Austin Roseberry, SA of the DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means, namely telephone.

Date: _____ 11/22/24 _____

City and state: _____ Dayton, Ohio _____

Peter B. Silvain, Jr.
United States Magistrate Judge

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Austin Roseberry, hereby duly sworn, declare and state:

**INTRODUCTION**

1.      I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA"). I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2.      I have been employed with the DEA since July 2012. I attended the DEA Academy which consisted of approximately 20 weeks of training in conducting federal drug trafficking investigations, handling confidential sources, conducting undercover operations, conducting mobile, static, foot and electronic surveillance, conducting tactical entry and vehicle arrest operations, defensive tactics, firearms, and additional aspects of conducting DEA lead investigations. I have been assigned to the DEA Dayton Resident Office since May of 2017.

3.      Since the time of my assignment with the DEA, I have been involved in narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics, and participated in undercover narcotics purchases.    Through training and experience, I am familiar with the how persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived.

1

## PURPOSE OF AFFIDAVIT

4.      I make this affidavit in support of an application for search warrants for the following residences – namely:

a.      ███████████████████████ including any outbuildings, garages, sheds, or vehicles located on its curtilage (hereinafter "**Subject Location 2**"). The **Subject Location 2** is described more fully in Attachment A-2, which is incorporated herein by reference.

b.      ███████████████████████, including any outbuildings, garages, sheds, or vehicles located on its curtilage (hereinafter "**Subject Location 4**"). The **Subject Location 4** is described more fully in Attachment A-4, which is incorporated herein by reference. (collectively, the "Subject Locations").

5.      As detailed more fully below, I submit that there is probable cause to believe that evidence, contraband, items illegally possessed, concerning the following violations of federal law exist and can be found at the Subject Locations:

a.      18 U.S.C. § 922(g)(1) and 924(a)(8) (felon in possession of a firearm);

b.      21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances);

c.      21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

6.      A list of specific individuals to be seized from the Subject Locations is attached hereto in Attachments B-2 and B-4, which are incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the evidence listed in Attachments B will be found at/in these locations.

2

7.      I have not included every detail of the investigation, but only information necessary to establish probable cause to search the properties described above for evidence of the above-described crimes.

### PROBABLE CAUSE

**A.      Introduction**

8.      Since 2019, the DEA has investigated a drug trafficking organization operating in the Dayton, Ohio, area known as the ██████. Specifically:

a.      The group – which distributes kilograms of fentanyl, methamphetamine, and cocaine – derives its name from the ████████████████ that it presents to members upon joining the organization. Comprised of over two dozen members, the ██████ collectively have an extensive presence on social media, posting images of their "initiation" ceremonies and membership on various online applications. I have viewed one or more posts on social media platforms from members of the group in which a new member is provided his ██████ and a bundle of cash to show membership in the ██████. I also know that the ██████ also provide its members with ██████ medallions that signify their participation in the illegal activities of this organization. For instance, I found social media posts of ██████ (Figure 1 below from in or around January 2024) wearing a ██████ and ████████ below from in or around 2021) wearing his ██████ h and flashing the number ██ ' and██

3



Figure 1



Figure 2



b.      Through its investigation, DEA has identified ██████ as the leader of the ██████  ██████ frequently develops sources of drug supply in Mexico or on the West Coast from whom he obtains bulk shipments of drugs.   He in turn redistributes these controlled substances to the Dayton, Ohio area through the membership of the ██████, including ██████ ████████████████████████████████████████████.   As detailed more fully below, law enforcement has identified all of these men – ████████████████ ██████████ as members of the ██████.

9.      During 2023 through the present, DEA has developed information that ██████ ████████████ remain active members in the ██████ and continue to traffic drugs on behalf of that organization.   For instance:

a.      During July 2023, under the direction of law enforcement, an informant made controlled purchases of bulk cocaine (i.e., an ounce quantity) from ██████ in the Dayton, Ohio area.   To arrange these transactions, ██████ used his cellular telephone.   In or around late fall 2023, law enforcement spoke with a person identified herein as CS-1.   CS-1 spoke with law enforcement in an effort to mitigate sentencing on a pending drug case.   CS-1 has prior drug convictions.   Despite those convictions, law enforcement considers CS-1 reliable and has been able to corroborate his information from other sources.   According to CS-1, CS-1 personally knew ██████ and had obtained bulk amounts of cocaine directly from ██████ during 2021 and early 2022.   CS-1 advised that ██████ was a member of the ██████ and dealt in kilograms of cocaine.   During fall 2024, law enforcement spoke with CS-2.   CS-2 has provided information to law enforcement on a long-term basis.   Law enforcement has been able to corroborate CS-2 information in the past and considers CS-2 credible.   CS-2 advised that the person I know to be CS-1 was currently working for ██████ as a "runner."   Based on my training and experience, I

5

know that CS-2 was explaining that CS-1 was currently delivering drugs on ████ behalf to ████ customers.

        **b.**     From in or around July 2023 to April 2024, under the direction of law enforcement, an informant purchased bulk quantities of methamphetamine and fentanyl from ████ in the Dayton, Ohio area. These deals were recorded and surveilled by law enforcement. Notably, to arrange these drug transactions, ████ used his cellular telephone to speak with the informant and facilitate the drug transactions.

      10.    During late summer and early fall 2024, a federal grand jury in United States District Court for the Southern District of Ohio returned indictments against members of the ████ as detailed below. Specifically:

        a.     On or about August 27, 2024, in Case Number ████, the grand jury indicted ████ on various federal drug charges, including a conspiracy to distribute and to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

        b.     On or about August 27, 2024, in Case Number ████, the grand jury indicted ████ on various federal drug charges, including conspiring to distribute and to possess with intent to distribute a mixture or substance containing a detectable amount of cocaine.

        c.     On or about August 27, 2024, in Case Number ████, the grand jury indicted ████ for distributing 50 grams or more of actual methamphetamine, a Schedule II controlled substance. That same day, this Court issued an arrest warrant for ████.

6

d. On or about October 22, 2024, in Case Number ▮▮▮▮▮ the grand jury indicted ▮▮▮ for conspiring to distribute and to possess with intent to distribute 5 kilograms or more of mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance.

11. As detailed more fully below, through physical surveillance, business records, and search warrants ▮▮▮▮▮▮ – to homes in the Dayton, Ohio area.

**B. Subject Location 2 – ▮▮▮▮▮▮**

12. Throughout its investigation of the ▮▮▮ – including physical surveillance – agents believe that ▮▮▮▮▮▮ (i.e., Subject Location 2).

13. During July 2023, law enforcement conducted a controlled purchase of methamphetamine from ▮▮▮. ▮▮ used a phone number ending in ▮▮ to facilitate this transaction. Law enforcement obtained a warrant to collect real-time location information from this phone number during in or around July 2023. During the time that this so-called ping was active, it generally located the ▮▮ phone overnight at Subject Location 2, indicating that ▮▮▮ routinely spent the night there.

14. During September 2023, law enforcement conducted another controlled purchase of methamphetamine from ▮▮▮. During this transaction, law enforcement observed ▮▮▮ arrive at Subject Location 2. ▮▮ then left Subject Location 2 and drove to the area of the planned drug transaction. Soon thereafter, ▮▮▮▮ arrived at the meet location and delivered bulk amounts of methamphetamine that ▮▮ had negotiated the sale of via cellular telephone.

15. On or about November 14, 2024, agents performed surveillance at Subject

7

Location 2 during the early morning hours of that day. Around 8:45 a.m., agents observed a Chevy Silverado arrive at the residence and pull into the garage of Subject Location 2. Around 9:18 a.m., ███████ and a female who appeared to be an individual identified herein as ███████ longtime girlfriend) left Subject Location 2. Specifically, ███████ backed up the Silverado from the garage of Subject Location 2. ███████ and ███ exited the Silverado and then briefly entered Subject Location 2. ███████ then exited Subject Location 2 and returned to the Silverado before driving away.

16.     On or about November 19, 2024, agents performed surveillance at Subject Location 2 during the morning hours of that day. Around 9:00 a.m., surveillance saw ███ arrive at Subject Location 2 in a black Jeep Cherokee and park in the driveway. ███████ then entered Subject Location 2 using a key in his possession. ███████ did not leave the residence prior to termination of surveillance.

17.     Throughout this investigation, DEA has learned that ███████ longtime girlfriend. For instance, CS1, who knows ███████ identified ███ as his longstanding girlfriend. Public records have tied ███████ to similar residences in the Dayton, Ohio, area since at least 2021. Law enforcement has observed ███████ driving at least one vehicle registered to ███ as recently as summer 2024. Notably, ███ listed Subject Location 2 as her home address several times during 2023 when attempting to obtain credit that year. When law enforcement attempted to confirm utilities for Subject Location 2, they returned to an unrelated property management company.

18.     In sum, ███████ has a longstanding connection to Subject Location 2. Law enforcement has observed him there on multiple occasions since summer 2023. As recently as November 19, 2024, agents observed him and his longtime girlfriend – who is also associated

8

with the residence – leaving that location during morning hours. ███████ has a key to Subject Location 2.

19.     On or about November 20, 2024, this Court authorized a federal warrant to search Subject Location 2 for ███████, a federal fugitive.  On November 22, 2024, federal agents executed that search warrant, knocking and announcing their presence at Subject Location 2. Agents called out the occupants of the house, and ███████ eventually emerged from the residence and was detained.  ███████ was not fully clothed.  Given the temperature outside, agents secured him and moved him back into the home for his safety.  Agents provided ███ an opportunity to get dressed.  To ensure their safety, officers conducted a Quarles inquiry of ███████ to make sure that there were no firearms in the room to which they planned to take him to get dressed.  ███████ responded that there was a firearm in the residence.  I know that ███ ███████ has a prior federal conviction for drug trafficking for which he was sentenced to over one year in prison.  I therefore know that he is prohibited from possessing a firearm.  Officers allowed ███████ to get dressed and took him to his bedroom.  While allowing him to do so, they observed a cellular telephone in plain view.  Based on my training and experience as well as my familiarity with the facts of this case, I know ███ historically has used cellular telephones to engage in drug activity.  Once ███ was dressed, agents escorted him from the residence.  As ███████ left the house, he told a woman at Subject Location 2 that there was "cheese" in a bag upstairs.  Based on my training and experience, I know that "cheese" is a slang term for bulk cash.  Through this investigation, I know ███████ does not have a legitimate job.  His spontaneous admission that there is bulk cash in Subject Location 2 confirms that he is actively trafficking controlled substances and likely uses his cellular telephone to engage in that activity.

9

C.  **Subject Location 4 –** ███████████████

20.  Throughout its investigation – including physical surveillance –agents believe that

████████████████████████████.

21.  During January 2023, while conducting a controlled buy from ███████████ (who is now deceased), law enforcement observed ███████ arrive at ███████ home prior to the deal.  DEA identified ███████ as well as the license plate on the vehicle that he drove to ███████ home.  DEA reviewed a law enforcement database that captured images of ███████ vehicle and found it parked in the vicinity of Subject Location 4.  (BMV records reflect that the vehicle was registered to an address in Dayton, Ohio).  Given this potential lead, DEA performed surveillance at Subject Location 4 and its surrounding areas during January 2023 and February 2023.  Twice during the week of January 22, 2023, agents saw ███████ car parked at Subject Residence 4.

22.  On or about May 23, 2023, at approximately 9:30 a.m., DEA established physical surveillance at Subject Location 4 and observed ███████ exit the residence, enter his vehicle and drive away.

23.  On or about November 20, 2024, this Court authorized a federal warrant to search Subject Location 4 for ███████, a federal fugitive.  On November 22, 2024, federal agents executed that search warrant, knocking and announcing their presence their presence at Subject Location 4. ███████ girlfriend and ultimately ███████ exited the residence.  In speaking with ███████ girlfriend, agents learned that there was a firearm inside of Subjection Location 4.  I know that ███████ has a prior federal drug conviction for drug trafficking for which he was sentenced to a term of imprisonment for over one year.  I know that it is illegal for ███████ to possess a firearm. ███████ girlfriend also advised that there was marijuana inside of the

10

residence. Agents ▮▮▮▮▮▮▮▮▮▮. He advised them that there was bulk cash inside of the residence – namely, $3,000 – and requested that agents give that money to his girlfriend. Through this investigation, I know that ▮▮▮ does not have legitimate employment. Given the admissions concerning the marijuana in the residence as well as the bulk cash, I believe that ▮▮▮▮ is still actively trafficking drugs and that indicia of that illegal activity will be found inside of his residence.

24.     Based on my training and experience, I know that individuals who traffic controlled substance often keep firearms with them for their protection. Drug trafficking is a dangerous business and therefore drug dealers keep weapons on themselves for their safety. The admissions concerning firearms at Subject Location 2 and Subjection Location 4 fit with this pattern of drug traffickers possessing weapons. It further confirms that other indicia of drug trafficking activity – including bulk currency, cutting agents, packaging material, indicia of membership in the ▮▮▮ organization may be found at both locations. I also know that, in this modern era, people typically carry cellular telephones and other smart devices capable of taking pictures. I know that individuals who illegally possess firearms often take pictures on their cellular telephones of themselves with these weapons. They also take pictures of the weapons themselves and share those pictures with their confederates. Additionally, drug trafficker often take pictures of themselves and their conspirators and store those images on their phones. These also use these devices to text or otherwise message the price of drugs to customers as well as to arrange drug locations. I also know that cellular telephones often capture location data that will show an individual's movements – including the locations of possible stash houses and the homes of confederates.

25.     Based upon my training and experience, I know that drug traffickers frequently

11

use multiple residences and vehicles to hide their drugs, drug trafficking materials, drug proceeds, and other evidence of illicit activity. Drug traffickers are always attempting to evade law enforcement detection. In order to do so, I know that drug traffickers commonly will hide portions of narcotics at multiple residences, such that if law enforcement executes a warrant at one residence, they will not be able to seize the entirety of a drug trafficker's supply of narcotics.

26.     Based on my training and experience, I know that drug traffickers frequently use multiple locations as "stash houses" for their drugs, drug proceeds, and drug trafficking paraphernalia. For example, traffickers frequently keep drugs, drug proceeds, and drug trafficking paraphernalia at separate locations in order to prevent the loss or seizure of their criminal livelihood in the event they are robbed or searched by law enforcement. Drug traffickers go to great lengths to place their drugs and drug proceeds in various locations to protect against their loss.   Based on my training and experience, and as I explain in more detail below, I believe that any property DTO members have access to and control over is likely to contain evidence relevant to my investigation, including, but not limited to, documents showing DTO members' travel for the purposes of drug trafficking; electronic devices, such as cell phones; drug proceeds; drugs; and drug trafficking paraphernalia, such as firearms.

27.     For all of the foregoing reasons, as well as for the additional reasons I explain in more detail in the section that follows, I believe that the Subject Locations will contain evidence of drug trafficking activities for the following reasons, among others:

a.       I know from my training and experience in drug investigations that traffickers often maintain in their residences and other locations which they control, such as houses and vehicles, controlled substances, books, records, receipts, notes, ledgers, and other papers relating to the procurement, distribution, storage and transportation of controlled substances to

12

include records showing the phone numbers and/or pager numbers of suppliers or customers, and other criminal associates. They frequently maintain receipts such as credit card billings, telephone bills and toll records, parking stubs, hotel reservations/records, airline tickets, gas receipts and various notes. They possess items used to package controlled substances. It is also common for these drug traffickers to maintain electronic devices, to include but not limited to, mobile telephones, computers, paging devices, answering machines, police scanners and money counters to facilitate their criminal activity. These items are commonly maintained in locations to which drug traffickers have frequent and ready access, i.e. homes, apartments, businesses, and automobiles.

        b.       It is common for drug traffickers to conceal narcotics, tools of used to process narcotics, narcotics records, narcotics proceeds, and other related items described above within their businesses, residences, and automobiles; with their criminal associates; or with other trusted individuals in order to conceal such items from law enforcement authorities.

        c.       Persons engaging in drug trafficking commonly conceal large amounts of currency, financial instruments, precious metals, and other items of value. It is common for drug traffickers to purchase items costing over ten thousand dollars. In doing so, traffickers will often violate federal structuring laws (Title 31, U.S.C. Sections 5324) by obtaining several cashier's checks and/or money orders in small increments from several institutions. Traffickers often utilize agents or "smurfs" to purchase these checks or money orders, the purchase of which generates receipts. The proceeds of drug transactions, and evidence of financial transactions relating to the obtaining, transferring, secreting or spending of large sums of money gained through engaging in narcotics activities is often found in the trafficker's residences, businesses, automobiles and other locations maintained for the purpose of concealing their activities.

13

d.     I know that narcotics traffickers often purchase and/or title assets and open accounts, such as utility accounts, in fictitious names, aliases, or the names of relatives, associates, girlfriends or business entities to avoid detection of these assets and accounts by government agencies. Even though these assets and accounts are in names other than the traffickers', the narcotics traffickers actually own and continue to use these assets and accounts and exercise dominion and control over them.

e.     Persons engaged in drug trafficking often take or cause to be taken photographs and/or videotapes of themselves, associates, drug proceeds or property derived from the proceeds derived from the sale of controlled substances. Traffickers usually maintain these items in their possession.

f.     I am aware, based on my training and experience that drug dealers frequently maintain firearms and weapons to protect both the controlled substances and proceeds derived from their sales. Drug traffickers maintain firearms as a use of force, or threat of force, against rival drug dealers and/or delinquent customers.

g.     It is common for drug traffickers to possess and maintain cellular telephones or other smart, internet-connected devices such as tablets, smart phones, laptops and computers. They often use these devices to communicate with other drug traffickers, their customers, or those that they use to transport cash and currency to their sources of supply.  These communications – often in the form of text messages or instant messages – will be present on a device for extended periods of time.  These devices also often hold the types of videos and photographs discussed above.

## CONCLUSION

28.     Based on the facts set forth in the Affidavit, I believe there is probable cause to

14

search the Subject Locations for the items detailed in Attachments B-2 and B-4.

*Austin Roseberry*

Austin Roseberry
Special Agent
Drug Enforcement Administration

Sworn and subscribed before me on this
_22nd_ day of November 2024.

Peter B. Silvain, Jr.
United States Magistrate Judge

15

## Attachment A-2

The place to be searched is _____ ("Subject Location 2")
including any outbuildings, garages and/or sheds on the curtilage. Subject Location 2 is a two
story single family residence with white and grey siding, a grey shingled roof and an attached
garage. The numbers _____ ' are displayed on the mailbox in the front yard. Subject Location 1
is located on the east side _____ with the front door of the residence facing west.
Subject Location 2 is further depicted in the following photograph.



**Attachment B-2**

1.      All records relating to violations of Title 18, USC § 922(g)(1) (felon in possession of a firearm) and Title 21 U.S.C. §§ 841(a)(1) and 846 (distribution and possession with intent to distribute a controlled substance and conspiracy to commit the same), including:

        a. Any and all controlled substances (as defined under Title 21, United States Code, § 812), including, but not limited to, methamphetamine;

        b. Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, turkey bags, mylar bags plastic envelopes, film canisters and cutting, conversion, and adulteration agents;

        c. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents);

d. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, §§ 841 and 846 and money wrappers, rubber bands, money containers, and money counting machines;

e. Bank account records, wire transfer records, bank statements, safe deposit box keys and records, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs, including gambling records;

f. Precious metals, jewelry, artwork, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

g. Any and all records, documents and deeds reflecting the purchase or lease of real estate, or improvements to real estate such as construction and renovation projects, vehicles, precious metals, jewelry, artwork, or other high-value items that could be obtained with the proceeds of the sales of controlled substances;

h. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances;

i. Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions;

18

j.  All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, contracts and payment receipts for construction and improvements to the physical premises, financial documents, vehicle registration information or ownership warranties and keys;

k.  Records, items, and documents reflecting travel for the purpose of participating in drug trafficking, including airline tickets, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations;

l.  Any and all electronic or communication devices of          (or reasonably believed to be used by them) including, but not limited to, computers, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads, or electronic storage media, and other electronic or communication devices that could be used to facilitate drug trafficking, including devices that could be used purchase airline tickets, hotels, and rental cars for the purposes of traveling to obtain controlled substances;

m.  Communications (both paper and digital form) between          and other members of the          as well as others concerning the possession, distribution, storage, and/or transfer of controlled substances, drug proceeds, and drug trafficking paraphernalia;

19

n. Records and information containing identifying information of coconspirators, including information that could be used to ascertain their whereabouts;

o. Firearms and ammunition;

p. Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

q. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

r. Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of controlled substances, firearms, drug proceeds, and/or other drug trafficking paraphernalia; and

s. Firearms boxes, manuals, and receipts or other paperwork related to firearms.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.